# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**ARTARA FERRELL,**   Case No. 1:19 CV 2289

    Plaintiff,

    v.   Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.   MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Artara Ferrell ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the Court affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in February 2017, alleging a disability onset date of February 6, 2017. (Tr. 169-70).[1] His claims were denied initially and upon reconsideration. (Tr. 95, 105). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on June 7, 2018. (Tr. 29-60). On September 19, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-18). The Appeals Council denied

---

1. Plaintiff filed a previous disability application that was denied at the initial stage in September 2016. *See* Tr. 189.

Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on October 1, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1982, Plaintiff was 34 years old on his alleged disability onset date. *See* Tr. 169. He originally alleged disability due to memory issues, muscle pain, stroke, asthma, anxiety, and depression. (Tr. 193).

Plaintiff believed he could not work due to his multiple sclerosis ("MS"), his eyesight, and his anxiety. *See* Tr. 36, 43-49. He had difficulty walking; he could not walk in a straight line and his balance was "off". (Tr. 44). Plaintiff's legs gave out on him about nine times in the prior year. *Id.* His hands shook and he sometimes dropped things; the left side was worse. (Tr. 45-46). Plaintiff testified he experienced MS flares every day, four or five times per day. (Tr. 51-52). He said these flares kept him from moving; his muscles tightened up and he felt like he could not breathe. (Tr. 47, 52). He had to relax and breathe while staying still for ten to fifteen minutes until the sensation went away. *Id.* Plaintiff's vision was blurry, despite corrective lenses, but he could see the television well enough to watch a show. (Tr. 49-50).

Plaintiff testified that he recently underwent a functional capacity test with a physical therapist; although he was there for four-and-a-half hours, he was only with the physical therapist for two. (Tr. 42-43). He "was beat" at the end of the two hours. (Tr. 43).

Plaintiff also had an alcohol use disorder which resulted in hospitalizations. (Tr. 37). He testified that he missed work due to a hangover once or twice in the prior fifteen years. (Tr. 38). He was three months sober at the time of the hearing. (Tr. 42).

From December 2017 through May 2018, Plaintiff worked four to five hours per day as a school cafeteria assistant. (Tr. 38). The job consisted of preparing food, cleaning up after kids, wiping tables, and getting food out of the coolers. (Tr. 39). On delivery days he lifted items weighing up to fifty pounds to put them in the coolers for about one to two hours; on other days, he lifted about twenty pounds (Tr. 39-40). He was "[b]asically on [his] legs" the whole shift and unable to sit; his walking worsened as the shift went on. (Tr. 46-47). At the end of a shift, Plaintiff was exhausted, like his body "just g[a]ve up"; he would go home and sleep. (Tr. 46). Plaintiff did not believe he could have worked an eight-hour shift at this job. *Id.* He left the job when school got out for the summer and because of his health. (Tr. 39).

Prior to that, in 2016 and 2017, Plaintiff worked in housekeeping 40 to 48 hours per week, but stopped due to anxiety and because his "body would flare up". (Tr. 40). In 2014 and 2015, Plaintiff worked roughly 40 hours per week stocking at Save A Lot. (Tr. 41). He quit after being diagnosed with MS. *Id.*

Plaintiff testified he was not receiving mental health treatment or taking medication for his anxiety. (Tr. 50). He described feeling depressed and not like himself. *Id.* He did not have difficulty getting along with others in his past work, but did struggle with concentration. *Id.* He described himself as "very forgetful" and that his concentration was "off". (Tr. 51). He was written up three to four times at his last job for forgetting to do things. *Id.*

Relevant Medical Evidence

Plaintiff treated at the Mellen Center for Multiple Sclerosis; he was diagnosed with MS in 2014. *See* Tr. 253. In November 2016, Plaintiff told Shauna Gales, P.A., that he took his Tecfidera prescription "sporadically". (Tr. 254). He reported symptoms of poor vision, poor balance, fluctuating leg weakness, and fatigue, along with poor memory and concentration. (Tr. 254-55).

3

Case: 1:19-cv-02289-JRK Doc #: 19 Filed: 11/05/20 4 of 20. PageID #: 752

On examination, Ms. Gales noted Plaintiff had a paretic, wide-based, ataxic, unsteady gait, without an assistive device. (Tr. 254). Ms. Gales noted that "[a]lthough pt repeatedly states he wants to get better, he is unwilling to take medications at this time and declines IVMP." (Tr. 255). She prescribed a prednisone taper and ordered MRIs. *Id.* Lael Stone, M.D., confirmed the examination and noted Plaintiff appeared drunk and did not want to take any medication for his MS. *Id.*

An MRI later that month revealed multiple intracranial white matter lesions compatible with MS. *See* Tr. 250. It also showed no new T2 lesions, no new enhancing lesions, and no significant parenchymal volume loss. *Id.* Dr. Stone noted that Plaintiff had a stable brain MRI and a stable cervical cord lesion. (Tr. 253). Plaintiff also again reported poor memory and concentration, and severe fatigue. (Tr. 252). Given Plaintiff's stability and lack of follow-up, Dr. Stone noted he would not pursue disease modifying therapy, but would monitor and prescribe Neurontin for symptomatic control. (Tr. 253).

In January 2017, Plaintiff went to the emergency room reporting right upper extremity weakness, right left extremity weakness, eye pain, and some chest pain with anxiety. (Tr. 247). On examination, he had an abnormal gait, and reduced strength in his right arm (4/5) and right leg (4+/5). (Tr. 249-50). A physician noted Plaintiff's symptoms improved after intravenous Solu-Medrol and he was discharged. (Tr. 251).

In April 2017, Plaintiff underwent a consultative psychological evaluation with Katherine Alouani, Psy.D. (Tr. 324-30). Plaintiff told Dr. Alouani that he quit his housekeeping job due to its physical demands. (Tr. 326). He reported daily activities of dressing, bathing, and grooming; he was able to clean and do laundry, but did not know how to cook. (Tr. 327). Plaintiff shopped with his mother. *Id.* Dr. Alouani observed Plaintiff's "[a]ttention and concentration were mildly

4

impaired", noting he could count and perform simple addition, remember three out of three objects after five minutes, and remember four digits forward and three digits backward. (Tr. 328).

Also in April 2017, Plaintiff returned to the Mellen Center. (Tr. 334). His anxiety was worse; his episodes of numbness, tingling, and tightness lasted up to twenty minutes and occurred daily. *Id.* He further reported depression, difficulty concentrating, and blurred vision. *Id.* His fatigue was noted to be moderate, he "ha[d] to spread tasks over throughout the day or multiple days as he tires easily." *Id.* Ms. Gales noted she would pursue a functional capacity examination "but also work on symptom improvement to see if he can get back to work." (Tr. 335). She increased Plaintiff's gabapentin dosage and started him on Lexapro for anxiety. (Tr. 336).

At a July 2017 visit with Ms. Gales, Plaintiff reported gabapentin helped his pain during the day, but he "still ha[d] a lot of pain at night", along with muscle tightness. (Tr. 387). Plaintiff reported depression, poor memory/concentration, and severe fatigue. (Tr. 388). He was independent in his activities of daily living but "need[ed] help with cooking and cleaning at times." *Id.* Ms. Gales noted Plaintiff was clinically stable, and not on disease modifying therapy. (Tr. 389). She further noted Plaintiff's depression, anxiety, and history of alcohol abuse; she increased his Lexapro dosage and noted to "consult health psychology to help with fatigue, insomnia and anxiety management". *Id.*

At a November 2017 visit, Plaintiff told Ms. Gales that if his MRI was stable "he would prefer to remain off [disease modifying therapy]." (Tr. 425). Ms. Gales noted "when he was previously on Tecfidera he did tolerate fine" and "[h]e was just not compliant with dosing." *Id.* Plaintiff continued to report numbness and tingling, worse at night; increased gabapentin "helped minimally." *Id.* He reported depression and anxiety, poor memory/concentration, and moderate

5

fatigue. (Tr. 426). Ms. Gales again noted Plaintiff was clinically stable, but his neuropathic pain "seem[ed] to be progressing." (Tr. 427). She adjusted medications. *Id.*

In March 2018, Plaintiff returned to Ms. Gales reporting no new neurological symptoms, but "significant fatigue, imbalance, and intermittent neuropathic pain as well as leg spasms." (Tr. 629). Gabapentin was again noted to help "minimally". *Id.* Plaintiff reported working part time doing prep work in the school kitchen for three months. *Id.* Plaintiff noted his mood was stable with Lexapro, but he had "good and bad days". (Tr. 630). He reported his memory and concentration were worse; he had trouble focusing and he was forgetful. *Id.* He reported moderate fatigue. *Id.* Ms. Gales ordered an updated brain MRI, instructed Plaintiff to establish care with a primary care provider, and adjusted his medications. *Id.*

In May 2018, Plaintiff underwent a physical therapy neuro functional capacity evaluation with Matthew Sutliff, PT, DPT, on referral from Ms. Gales. *See* Tr. 644. After an evaluation, Mr. Sutliff opined Plaintiff was capable of frequently lifting and carrying fifteen to thirty pounds, an occasionally lifting and carrying 25 to 75 pounds. (Tr. 650). He opined Plaintiff had no limitations in sitting, standing, or walking. (Tr. 651). He had some postural restrictions, and could use arm, leg, and hand controls. *Id.* Mr. Sutliff concluded that Plaintiff "is qualified to work on a full time basis . . . under the Dictionary of Occupational Titles (DOT) classification of [m]edium physical demands." *Id.*

During the relevant time period, Plaintiff also had multiple emergency room visits, often related to alcohol. *See* Tr. 352-53, 403-06, 440-54.

*Opinion Evidence*

In March 2017, State agency physician Diane Manos, M.D., reviewed Plaintiff's records and opined Plaintiff could occasionally lift and carry twenty pounds, and frequently carry ten. (Tr.

6

70). She believed he could stand or walk for two hours in an eight-hour workday, and sit for about six hours. (Tr. 70). His ability to push or pull was limited in his right upper extremity. *Id.* He had various postural restrictions, as well as manipulative restrictions in his right arm and hand. (Tr. 70-71). Dr. Manos further opined Plaintiff should be limited to no heights, commercial driving, or hazards due to his MS. (Tr. 72).

Also in March 2017, State agency physician Karen Terry, Ph.D., reviewed Plaintiff's records and opined Plaintiff could perform one to three step tasks ("but could struggle as complexity increases"). (Tr. 73). She further opined Plaintiff's concentration and pace were "variable", noting that his "[s]omatic focus serves to magnify his [symptoms] thereby impinging on sustainability." *Id.* She continued: "Nonetheless, he can maintain attention, make simple decisions, and adequately adhere to a schedule. May need some flexibility in terms of time limits and production standards." *Id.* Regarding Plaintiff's adaptation limitations, Dr. Terry further opined that Plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting, but "retains the ability to perform job duties that remain relatively static; any necessary changes need to occur infrequently and be adequately and easily explained to him ahead of time." (Tr. 74).

In April 2017, Dr. Alouani opined Plaintiff could "understand, remember, and carry out instructions throughout the evaluation and likely is able to do so in simple situations." (Tr. 329). She opined he was "likely to be able to perform simple tasks, but may struggle with more complex tasks". *Id.* Dr. Alouani believed Plaintiff's work history and presentation at the examination indicated he was able to respond appropriately to supervision and coworkers, but noted his alcohol use "may impair his ability to respond appropriately at times." (Tr. 330). Finally, Dr. Alouani

opined Plaintiff "continues to use alcohol apparently as a coping tool which is likely to impair his ability to respond appropriately to work-related pressures." *Id.*

In May 2017, State agency physicians Abraham Mikalov, M.D., and Aracelis Rivera, Psy.D., reviewed Plaintiff's records and largely affirmed Dr. Manos's and Dr. Terry's assessments. (Tr. 83-90). Dr. Rivera added a social limitation of superficial interaction. (Tr. 89).

In May 2018, Ms. Gales filled out a "medical source statement" requesting her opinion regarding Plaintiff's abilities. (Tr. 641). She wrote "Please see attached Functional Capacity Eval" and attached Mr. Sutliff's evaluation, which, as discussed above, concluded Plaintiff could perform medium exertional work. *See* Tr. 641-52.

<u>VE Testimony</u>

A VE appeared and testified at the administrative hearing. (Tr. 54-59). The ALJ asked the VE to consider an individual with Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ. *See* Tr. 55-57. The VE testified that such an individual could not perform Plaintiff's past work, but could perform other jobs such as addresser, cutter and paster, document preparer, touch up screener for printed circuit board assembler, or toy stuffer. (Tr. 56-57). Plaintiff's counsel and the VE then had the following exchange:

> [Counsel]: So, for any of the hypothetical questions, if we add in that individual would need flexibility, in terms of time limits and production standards, how would that affect your answer?
>
> [VE]: What do you mean by flexibility?
>
> [Counsel]: Well, because of his concentration and pace are variable, he's going to be working at a slower pace at times. He's not going to be concentrating at times. So, there's going to have to be some flexibility in terms of expectations.
>
> [ALJ]: Okay, well, that's why I did ask for jobs that had no strict time or production standards.

| | | |
|---|---|---|
| [Counsel]: | | Well, I'm not talking about strict. Because all jobs have some time limits and production standards, is that correct? |
| [VE]: | | Yes. |
| [Counsel]: | | Okay, so he's going to need some flexibility, in terms of that. |
| [VE]: | | I would need it put in vocational terms. Like if you want to tell me how much time that might be off task, because of that. |
| [Counsel]: | | Okay, so say he's going to off task 10% of the time. |
| [VE]: | | That's not covered by the DOT or SCO, but my professional experience, 10% is 42 minutes over and above scheduled breaks. At that point, I think that's work preclusive. |
| [Counsel]: | | So, if he was going to be, again, 10% less productive, his pace was going to be 10% slower than an average worker, how would that affect your answer? |
| [VE]: | | Unless it was a sheltered workshop, that wouldn't be tolerated and we don't give consideration to sheltered workshops. So, there would be no jobs. |

(Tr. 58-59).

ALJ Decision

In his September 19, 2018 opinion, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2021, and had not engaged in substantial gainful activity since his February 6, 2017 alleged onset date. (Tr. 12). He found Plaintiff had severe impairments of multiple sclerosis with neurocognitive disorder depressive disorder, and alcohol use disorder; however, none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. *Id.* Thereafter, the ALJ set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: ability to push and pull with the upper extremities is limited to frequent; could frequently climb ramps and stairs, but not climb ladders, ropes and scaffolding; occasionally balance, stoop, kneel, crouch and

9

> crawl; right overhead reaching, right handling and right fingering are limited to frequent (the claimant is right hand dominant); must avoid all exposure to working at heights, commercial driving and work hazards; can perform simple one-to-three step task[s]; he can maintain attention to make simple decisions and adequately adhere to a schedule for simple one-to-three step tasks; limited simple interaction with others; can perform job duties that remain relatively static; limited simple interaction with others; can perform job duties that remain relatively static any necessary changes need to occur infrequently and need to be explained ahead of time; and he cannot have strict time or production quotas.

(Tr. 14). Given his age, education, work experience, and RFC, the ALJ concluded there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 17). Therefore, the ALJ found Plaintiff not disabled. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises two objections to the ALJ's decision. First, he contends the ALJ erred in evaluating his subjective symptom of disabling fatigue. Second, he contends the ALJ erred in his evaluation of the opinion evidence, specifically that the ALJ failed to explain his exclusion of a limitation included in an opinion to which he assigned great weight. For the reasons discussed below, the Court finds no error and affirms.

Subjective Symptoms

Plaintiff first contends the ALJ erred in failing to properly evaluate his complaints of fatigue. Plaintiff contends the ALJ unreasonably found his symptom statements not entirely consistent with the record but "did not point to any inconsistencies in the record to refute [his] allegations of disabling fatigue." (Doc. 14, at 14). For the reasons discussed below, the Court finds no error.

In considering symptoms, an ALJ follows a two-step process, prescribed by regulation. An ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms; second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(a). In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain; and (6) any other measures used

to relieve pain. 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL 5180304.[2] Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Sixth Circuit has explained, interpreting the precursor ruling SSR 96-7p, that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such a determination is "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]"). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

---

2. SSR 16-3p replaced SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. It directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms" and removes the term "credibility". *Id.* at *1. Both rulings, however, refer to the same two-step process articulated in 20 C.F.R. § 404.1529 and the same factors to consider. *See Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (noting that the updated ruling was to "clarify that the subjective symptoms evaluation is not an examination of an individual's character") (internal quotation omitted). Thus, "[w]hile the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where the usage of the term is most logical." *Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio), *report and recommendation adopted*, 2018 WL 309369.

The ALJ set forth the two-step process and summarized Plaintiff's testimony (including that he "moves slowly, and [h]is multiple sclerosis flares are unpredictable", cause him to be "unable to move", and that they last "up to 15 minutes and occur four to five times per day"). (Tr. 15). He then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

*Id.*

Plaintiff cites his own testimony that his fatigue was more limiting. *See* Doc. 14, at 14. Specifically, he cites his testimony that he was exhausted and had to sleep after a four to five hour shift as a cafeteria attendant (Tr. 38, 46), and that he was "beat" after a two-hour functional capacity examination (Tr. 43). But this testimony is necessarily at odds with the ALJ's RFC. That is, exhaustion after a job that required Plaintiff to be "on [his] legs" (Tr. 46) for a four-hour shift is not necessarily inconsistent with the ALJ's RFC which limited Plaintiff to a range of sedentary work (Tr. 14). The same is true, at least to some degree, for Plaintiff's report of fatigue after a two-hour functional capacity evaluation during which Plaintiff was tested to determine his maximum physical abilities. *See* Tr. 644-51.

Further, within the analysis of the medical evidence that follows the ALJ's statement regarding Plaintiff's symptoms, the ALJ noted that the objective medical evidence demonstrated Plaintiff had an abnormal gait, and right upper extremity weakness and tingling. (Tr. 15) (citing Tr. 247-48, 253). The ALJ also acknowledged that Plaintiff "deals with fatigue, imbalance, and intermittent neuropathic pain and leg spasms that limit his ability to stand and walk". *Id.* (citing Tr. 629-30). The ALJ further noted Plaintiff's "sporadic use of prescribed Tecfidera prescriptions

14

for his multiple sclerosis." (Tr. 15-16) (citing Tr. 250 ("[h]as script for Tecfidera but takes this sporadically")). Next, the ALJ noted he assigned "great weight" to the most recent State agency opinions because "[t]he opinions that the clamant could perform a reduced range of sedentary work with the ability to perform simple one-to-three step static jobs, tasks is consistent with [his] statements regarding his ability to perform past work, and the consultative examination report of Dr. Alouani at Exhibit 3F." (Tr. 16) (citing Tr. 323-31).

Finally, in assessing Plaintiff's RFC, the ALJ described in detail Ms. Gales's opinion, based on observations of Plaintiff during a functional capacity evaluation where the therapist found, *inter alia*, that Plaintiff "could walk without an aid", "could climb ramps and stairs", and "was able to walk 50 feet without complaints of pain". (Tr. 16) (citing Tr. 647, 649). The ALJ did not, however, adopt Ms. Gales's opinion (based on the functional capacity evaluation) that Plaintiff could perform medium work, because he found "it does not take into consideration the unpredictable nature of the claimant's multiple sclerosis which can result in fatigue and difficulty with balance." (Tr. 16). That is, the ALJ specifically stated he was limiting Plaintiff further than Ms. Gales – his own treating provider – opined, due in part to his fatigue.

Additionally, the Court notes that earlier in the ALJ's decision at Step Two, the ALJ cited: (1) the fact that Plaintiff was able to perform some part-time work since his alleged onset date; (2) the fact that Plaintiff is independent in his activities of daily living, including an ability to dress, bathe, and groom himself, as well as clean and do laundry. (Tr. 13-14) (citing Tr. 327, 629-31).

All of the above are appropriate factors. *See, e.g.*, *Walters*, 127 F.3d at 531-32 (ALJ may discount Plaintiff's statements of disabling symptoms where record lacks objective, physical, or clinical evidence of disabling severity and statements are inconsistent with activities of daily living); *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017) (non-compliance

15

with prescribed medication is a valid reason to discount credibility); *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) ("[T]he ALJ did not err by considering Miller's ability to maintain part-time employment as one factor relevant to the determination of whether he was disabled."); *Potter v. Comm'r of Soc. Sec.*, 223 F. App'x 458, 461-62 (6th Cir. 2007) (inconsistency between subjective reports and daily activities a valid reason to discount subjective symptoms); *see also* 20 C.F.R. § 404.1571 (ability to perform work at less than substantial gainful activity level "may show that you are able to do more work than you actually did").

Reading the ALJ's decision as a whole, the Court finds he addressed several of the required factors from the regulations, including the objective medical evidence, Plaintiff's daily activities, and Plaintiff's medication usage. *See* 20 C.F.R. § 404.1529(c). And his statements in this regard are supported by substantial evidence in the record. Further, the ALJ acknowledged Plaintiff's fatigue and rejected a less restrictive opinion from a treating provider specifically because of it. *See* Tr. 16 ("the undersigned accords little weight to the conclusion that the claimant could perform medium work as it does not take into consideration the unpredictable nature of the claimant's multiple sclerosis which can result in fatigue and difficulty with balance"). ("In light of the above, the Court finds the ALJ did consider many of the applicable factors throughout the decision. The fact that the ALJ did not also summarize his consideration of these factors in a single paragraph is not reversible error." *Carr v. Saul*, 2019 WL 3729265, at *5 (N.D. Ohio) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006)); *see also Kornecky*, 167 F. App'x at 508 ("Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.") (internal quotation and citation omitted).

Although Plaintiff urges the Court to find the ALJ failed to properly evaluate Plaintiff's fatigue symptom, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). For the reasons stated above, the Court finds the ALJ's evaluation of Plaintiff's subjective symptoms supported by substantial evidence.

Opinion Evidence

Plaintiff next contends the ALJ erred in not including in the RFC a statement from Dr. Rivera's opinion regarding Plaintiff's need for flexibility in time limits and production standards (Tr. 89), despite assigning "great weight" to that opinion. (Doc. 14, at 15-16). The Commissioner responds that: (1) it is not clear the ALJ's RFC is inconsistent with this restriction, and (2) an ALJ is not required to explain each and every limitation adopted or rejected from any opinion. (Doc. 16, at 11-12). Plaintiff replies that VE testimony indicates this particular restriction differs from the ALJ's RFC. For the reasons discussed below, the Court finds no error and affirms.

> The ALJ evaluated the state agency opinions – including Dr. Rivera's – explaining:
>
> The undersigned accords great weight to the most recent State agency medical and psychological consultants' opinions at Exhibit 3A. The opinions that the claimant could perform a reduced range of sedentary work with the ability to perform simple one-to-three step static jobs, tasks is consistent with the claimant's statements regarding his ability to perform past work, and the consultative examination report of Dr. Alouani at Exhibit 3F. Dr. Alouani observed the claimant to be capable of following instructions, understanding questions and engaging in conversation (exh. 3F).

(Tr. 16).

> In addressing concentration and persistence limitations, Dr. Rivera stated:
>
> Concentration and pace variable. Somatic focus serves to magnify his [symptoms], thereby impinging upon sustainability. Nonetheless, he can maintain attention,

17

> make simple decisions, and adequately adhere to a schedule. May need some flexibility in terms of time limits and production standards.

(Tr. 89). Plaintiff specifically argues the ALJ's erred in failing to include the restriction that Plaintiff "[m]ay need some flexibility in terms of time limits and production standards", *id.* (Doc. 14, at 6). The Court disagrees.

First, the Sixth Circuit has explained that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Second, the restriction to which Plaintiff points is phrased in non-definitive language, using the word "may". Other judges have found no error in the failure to include similar limitations. *See, e.g.*, *Golden v. Berryhill*, 2019 WL 2109322, at *7 (N.D. Ohio) ("Substantial evidence supports the ALJ's determination not to [include certain limitations], as Dr. Hill indicated these limitations not as requirements, but rather as possibilities, as she wrote that Plaintiff "may need" these additional steps. And Dr. Hill did not provide further explanation as to when Plaintiff may need these additional instructions. Accordingly, the undersigned recommends that the Court find that substantial evidence supports the ALJ's decision to not include Dr. Hill's indication that Plaintiff may need extra time repetition and hands-on demonstrations in his MRFC for Plaintiff."), *report and recommendation adopted sub nom*, *Golden v. Comm'r of Soc. Sec.*, 2019 WL 2106566. Indeed, at the hearing the VE herself indicated that such a limitation was vocationally vague. *See* Tr. 58 ("I would need it put in vocational terms. Like if you want to tell me how much time that might be off task, because of that."). It was only when counsel provided an interpretation of the limitation of "may need flexibility" (to mean off task ten percent of the time, ten percent less productive, or ten percent slower), that the VE testified such a limitation would preclude work.

*See* Tr. 58-59. But this is counsel's interpretation of Dr. Rivera's opinion, not Dr. Rivera's. And it is the ALJ who is "tasked with converting medical statements into vocationally relevant residual functional capacity findings", *Tucker v. Berryhill*, 2017 WL 6442142, at *5 (M.D. Tenn.), and an ALJ is not required to use "the exact language of [the medical] professionals" when incorporating limitations in the RFC, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014).

Third, it is the ALJ's duty to formulate the RFC based on all the evidence of record and it need not identically match any particular medical opinion. *See* 20 C.F.R. § 404.1545(a); *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a Plaintiff's RFC.").

Fourth, the reasons-giving requirement applies only to treating sources. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Cook v. Comm'r of Soc. Sec.*, 2020 WL 3424502, at *6 (S.D. Ohio) (report and recommendation) ("[B]ecause Drs. Baker and Reid were not treating sources, the ALJ was not obligated to satisfy the reasons-giving requirement when she declined to adopt their proposed limitation that Plaintiff might need occasional flexibility with breaks."). The ALJ here stated he gave "great weight" to this opinion, not that he was adopting it *in toto*.

Fifth and finally, the ALJ at the hearing explained that he included limitations to accommodate this opined restriction, at least to the degree he found it supported. *See* Tr. 58

("[T]hat's why I did ask for jobs that had no strict time or production standards."). And the ALJ's RFC contains numerous mental restrictions, including that "job duties . . . remain relatively static", "necessary changes need to occur infrequently and need to be explained ahead of time", and no "strict time or production quotas." (Tr. 14). These are further supported by other record evidence and analysis by the ALJ. For example, at Step Two, the ALJ found Plaintiff had moderate limitation in concentration, persistence, and pace, noting that his attention and concentration "were impaired during psychological testing" [citing Tr. 327], that he "struggled to perform more complex tasks" [citing Tr. 329];" and that his "ability to concentrate and persist appears to wax and wane depending on alcohol use [citing Tr. 543]. (Tr. 14).

Thus, even if the ALJ's decision did not precisely mirror the non-definitive opinion that Plaintiff "[m]ay need some flexibility in terms of time limits and production standards", the Court finds no error in the ALJ's analysis of Dr. Rivera's opinion and that the RFC is supported by substantial evidence in this regard.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

                                                 s/ James R. Knepp II
                                                United States Magistrate Judge